UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRYANT R. PARKER, II,

                  Plaintiff,          CIVIL ACTION NO. 12-cv-12485

     vs.

                            DISTRICT JUDGE PAUL D. BORMAN

COMMISSIONER OF         MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                  Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Bryant Parker seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment and Remand (docket no. 11) and Defendant's Motion for Summary Judgment (docket no. 14). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 4.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

I.     **RECOMMENDATION:**

This Court recommends that Plaintiff's Motion for Summary Judgment and Remand (docket no. 11) be GRANTED IN PART and DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 14) be DENIED.

## II.     PROCEDURAL HISTORY:

Plaintiff filed an application for Supplemental Social Security Income with a protective filing date of June 18, 2009, alleging that he had been disabled since November 1, 2008, due to back pain. (*See* TR 12, 14.)   The Social Security Administration denied benefits.   (*See* TR 12.)   Plaintiff requested a *de novo* hearing, which was held on October 21, 2010, before Administrative Law Judge (ALJ) J. William Callahan, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing past relevant work as a data-entry clerk.  (TR 17-18.)   The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced this action for judicial review.   The parties then filed their instant Motions.

## III.    PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff was 21 years old at the time of the administrative hearing and 19 years old at the time of alleged onset.   (*See* TR 28.)   At the time of the hearing, Plaintiff lived with his mother and two brothers.  He was unmarried, had no children, and had no source of income.  (TR 33.)  Plaintiff used the bus as his primary means of transportation, and his mother did the household cooking.  (TR 32, 52.) Plaintiff testified that he attended high school through ninth or tenth grade; he then obtained a GED through a vocational school and data-entry training through job corps.  (TR 28.)  He also testified that he attended the job corps program for one year and that he earned a certificate of completion for the data-entry program.  (TR 29.)   But he indicated that while he earned the certificate of completion, he did not take the appropriate test to become officially certified in the field of data entry because "[he] didn't study for it. . . . [he] was slacking."  (TR 30, 60.)  When questioned further by the Vocational Expert, Plaintiff testified that his training did not include taking

2

computers apart; it only included data entry.[1]  (TR 57-58.)  Plaintiff indicated that he never worked in the data-entry field because he did not take the certification test.  (TR 60.)

Plaintiff testified that he had last worked making sandwiches at Subway in 2008 for approximately two months.  (TR 37.)  He told the ALJ that he was laid off because he wasn't fast enough at making sandwiches.  (TR 38.)  Plaintiff further testified that before he worked at Subway, he spent two or three months inspecting batteries on an assembly line and a month inspecting potato chip bags before shipping; he found both positions through a temp agency.  (TR 38-39.)  At the time of the hearing, he was not employed.

Plaintiff testified that he was unable to work due to injuries that he incurred during an automobile accident that occurred on April 12, 2009.  He stated that at the time of the accident, he felt a sharp pain in his back and neck, but it went away shortly after he got out of the vehicle.  (TR 53.)  Plaintiff indicated, however, that following the accident, he started having memory problems (TR 40, 46-47), back problems (TR 45), vision problems, hearing problems (TR 46), and headaches (TR 46-47, 51).  Plaintiff stated that his back pain radiates to his knees, right arm, neck, and shoulders.  (TR 46, 49.)  Plaintiff testified that his back pain presents through a sharp pain in the middle of his back about three days a week, and he has consistent (but worse) pain in his lower back on a daily basis.  (TR 50-51.)  On a scale of one to ten, Plaintiff indicated that his pain was about

---

[1]Plaintiff answered "no" to the following question: "I just want to make sure sir, you were actually doing data entry, you weren't physically repairing the computers?"  (TR 58.)  Plaintiff asserts that his answer is unclear because of the VE's compound question.  (Docket no. 9.)  When considered out of context, Plaintiff is correct.  When read in context, however, and when considered along with Plaintiff's answers to the ALJ's questions, Plaintiff's answer is clear: he took data entry courses; he completed the data entry courses; he did not take the data entry certification test; and he did not take any courses in which he learned how to take apart and repair computers.  (*See* TR 28-30, 57-58.)  As part of his data-entry education, Plaintiff learned keyboarding, basic word processing, spreadsheet functions, and basic office skills like how to copy papers.  (TR 59.)

an eight, and he stated that he could lift about five pounds. (TR 44-45, 51.) He testified that his knees sometimes start to shake, and then sometimes his right knee will "pop." (TR 50.) Plaintiff testified that his headaches occur in the middle of his head, "up under the skull;" he told the ALJ that they come on about two times a week, and they last all day. (TR 51-52.) He stated that he has blurred vision, ringing in his ears, short-term memory loss, and confusion. (TR 33, 45-46, 47.)

Plaintiff testified that he started seeing a neurologist, Dr. Lucia Zamorano, about a week after the April 2009 accident. (TR 41.) Plaintiff indicated that Dr. Zamorano tested his eyes, but she did not give him a diagnosis. (TR 46.) He further indicated that Dr. Zamorano gave him steroid injections in an attempt to relieve his back pain, but the injections did not help. (TR 49-50.) He also tried taking Vicodin, but it was too strong for him, so at the time of the hearing, he was taking Tylenol 3 with Codein (with no side effects), which Plaintiff indicated helped a to reduce his pain from an eight to a five on a ten-point scale. (TR 48, 52.) Plaintiff testified that he had a CAT scan in an attempt to determine the source of his headaches, vision problems, memory problems, and hearing problems. He was also told to see an eye doctor, but at the time of the hearing, Plaintiff had not done so. (TR 34.)

The ALJ asked Plaintiff why he had not seen the eye doctor, and Plaintiff stated that he "ha[s]n't had the time to see a (sic) eye doctor." (TR 34.) When asked what he was doing that kept him too busy to see the doctor, Plaintiff stated, "Nothing at all, just sit down, watch TV." (TR 34; *see also* TR 43-44.) The ALJ, attempting to clarify the manner in which Plaintiff spent his days, asked Plaintiff to describe his activities the day before the hearing. (TR 34-35.) Plaintiff testified that he walked about twenty or thirty minutes to the store, which was "like [a] mile," but "[n]ot even a mile" away from his home, to get an energy drink. (TR 35-36.) He returned to his home "say afternoon, around ten." (TR 37.) Plaintiff then indicated that he "just went in the house, relaxed."

4

(TR 36.)  He spent the afternoon sitting at his computer or laying down.  (TR 36-37.)

    **B.**    **Medical Record**

    Plaintiff was injured in an automobile accident on April 12, 2009, and on April 22, 2009, he presented to Dr. Lucia Zamorano, MD, a neurologist, with a limp on his right side and complaints of sharp pains in his back when lying down or sleeping and of headaches.  (TR 290.)  Dr. Zamorano ordered Plaintiff to undergo physical therapy for treatment and evaluation.  (TR 284.)  Plaintiff attended physical therapy from April 27, 2009, through March 19, 2010, which helped but did not eliminate Plaintiff's symptoms.  (*See* TR 323-457.)

    While attending physical therapy, Plaintiff continued to report to Dr. Zamorano.  (*See* TR 287-98.)  On June 10, 2009, Plaintiff returned to Dr. Zamorano with complaints of neck pain, lumbar pain, and short-term memory difficulties.  (TR 289.)  He also noted that his pain had begun radiating into his shoulders and right leg.  (TR 273.)  Plaintiff informed Dr. Zamorano that his physical therapy was "helping and hurting."  (TR 298.)  Dr. Zamorano's examination of Plaintiff revealed mostly unremarkable results, but his musculoskeletal exam revealed "paravertebral muscle spasm and tenderness in the cervical area with limitations in the rotation, flexion, and extension."  (TR 275.)  There were similar results in the lumbrosacral spine.  (TR 275.)  Dr. Zamorano prescribed Vicodin and Diazepam.  (TR 206-07.)  She also ordered Plaintiff to continue physical therapy, ordered an MRI of Plaintiff's spine, and recommended that Plaintiff wear a back brace.  (TR 205, 275.)  On July 24, 2009, Dr. Zamorano appears to have discontinued Plaintiff's Vicodin prescription and replaced it with a prescription for Tylenol 3.  (*See* TR 199.)

    Plaintiff underwent his MRI on July 27, 2009, which showed a disc bulge at L4-5 that

encroaches the anterior epidural space and bilateral inferior nerve root recesses.[2]  (TR 315-17.)

On October 15, 2009, Plaintiff returned to Dr. Zamorano for a follow-up appointment.  (TR 288.)  The notes are illegible, but a week later, on October 22, 2009, Plaintiff underwent testing for vertigo and a possible closed head injury.  (*See* TR 229.)  Three of Plaintiff's six oculomotor studies were found "abnormal," Plaintiff's active head rotation was found "abnormal," and the test found central vestibular dysfunction.  (TR 305.)  Among other recommendations was a suggestion that Plaintiff "may benefit from a monitored exercise program to reduce the risk of falling."  (TR 305.)

Plaintiff attended a follow-up appointment with Dr. Zamorano on November 5, 2009, and on November 23, 2009, Dr. Zamorano administered epidural shots in an attempt to alleviate Plaintiff's symptoms.  (*See* TR 238-39.)  Dr. Zamorano ordered Plaintiff to continue physical therapy following the injections.  (*See* TR 272.)  Plaintiff presented to Dr. Zamorano on January 7, 2010, with complaints of severe headaches, lower back pain, and his legs giving out.  (TR 288.)  On February 4, 2010, Plaintiff told Dr. Zamorano that he had itching and skin peeling on the areas where he had received the injections.  (*See* TR 287.)  On March 19, 2010, Plaintiff's last physical therapy treatment (due to a termination of insurance benefits) found him with continued cervical pain, lumbar pain, and right-shoulder pain.  (TR 323.)

On May 27, 2010, Plaintiff returned to see Dr. Zamorano with continued complaints of back pain, right shoulder pain, bilateral knee pain, and cervical neck pain.  (TR 263.)  Plaintiff informed Dr. Zamorano that he had only mild improvement after eight months of physical therapy, and he stated that he did not wear his back brace regularly.  (TR 263.)  Dr. Zamorano noted that the

---

[2]The initial MRI report notes that there was also mild disc space narrowing at L3-4, but an Addendum notes that "[r]e-review of the study and report suggest L3-L4 as normal." (*Compare* TR 315, *with* TR 316-17.)

November epidural injections resulted in "no improvement," so Plaintiff had chosen not to receive any additional injections. (TR 263.) She also noted that Plaintiff was not interested in surgery and that he wanted to "discuss other conservative treatment options." (TR 263.) Plaintiff's examination results were remarkably similar to his June 10, 2009 examination results. (*Compare* TR 263-264, *with* TR 275.) Ultimately, Plaintiff and Dr. Zamorano chose to proceed with manipulation under anesthesia (MUA), which was scheduled for June 2010. (TR 264.) On June 18 and 19, 2010, Dr. Zamorano performed the MUA on Plaintiff's cervical, thoracic, and lumbar spine and on his knees. (TR 291-98.) Plaintiff noted a 20% to 30% pain reduction from the MUA. (TR 300.)

On November 6, 2010, Plaintiff reported to the emergency room with neck and lower-back pain and right-leg pain. (TR 463.) He rated his pain at an 8 on a 10-point scale, but he had no difficulty walking, and he had a full range of motion. (TR 464, 467, 473-74.) Plaintiff was prescribed pain medication and released. (TR 468, 472-73.)

Throughout Plaintiff's course of treatment with Dr. Zamorano, she opined that he was "totally disabled from work" due to "lumbar disc disease." (*See* TR 197, 267, 266.) The record contains no explanation for these assessments.

After filing his application for benefits, on September 9, 2009, Plaintiff underwent a consultative examination with Dr. Bina Shaw. (TR 187-93.) Dr. Shaw found that Plaintiff's visual acuity was 20/15 without glasses, his range of motion in cervical and lumbar were full, she felt no spasms or palpitations, there was no tenderness in Plaintiff's spine, and he had a full range of motion in his hips, knees, ankles, shoulders, elbows, and wrists. (TR 188.) She noted that Plaintiff's muscle power was 5/5 in all extremities, and that Plaintiff could get off and on the examination table without any assistance. (TR 188.) Dr. Shaw found that Plaintiff could sit, stand, and walk, bend limitedly, and could lift at least 10 to 15 pounds. (TR 188.) She opined that "[Plaintiff] can work,"

7

and diagnosed Plaintiff with "Chronic cervical and lumbar strain after [Motor Vehicle Accident]."
(TR 188.)  On September 23, 2009, a state-agency reviewing physician, Claire Issa, M.D., reviewed
Dr. Shaw's findings and opined that Plaintiff's asserted limitations were not fully credible.  (TR
196.)

  **C.**  **The Vocational Expert**

  The ALJ asked the VE to describe Plaintiff's past relevant work, and the VE noted that she
did not have any significant information on Plaintiff's work history.  (TR 61.)  She indicated that
based on the information in the record and his testimony at the hearing, Plaintiff appeared to work
as a general laborer through a temporary agency, that he had training from job corps, and that he had
worked at Subway.  Therefore, she explained, his work could best be characterized under the DOT
as a sandwich maker (described as medium, unskilled) and a hand packager (described as medium,
unskilled).  (TR 61-63.)  Plaintiff, however, described his job as a sandwich maker in a manner that
would fit the "light" category.  (*See* TR 63.)  The VE noted that she could not determine whether
these positions had been performed in a manner necessary to be considered substantial work for
purposes of Plaintiff's application.  (TR 61.)  The VE also discussed Plaintiff's completion of his
training program for data entry and his failure to take the appropriate certification test.  Therefore,
she explained, Plaintiff has some ability to perform general office jobs, such as a typist (described
as sedentary and semi-skilled), and data-entry clerk (described as sedentary and semi-skilled).  (TR
62.)

  The ALJ asked the VE to assume that the Plaintiff could lift 10 to 15 pounds and had no
limitations with respect to standing, walking, sitting, pushing, or pulling.  (TR 63.)  The ALJ asked
if Plaintiff could perform any of his past work with such limitations.  (TR 63.)  The VE testified that
Plaintiff could perform his past work as a sandwich maker, but only if she were to accept Plaintiff's

8

assertion that the work was done at the light exertion level.  (TR 63.)  The VE acknowledged that

in her experience, such work was typically done at the light exertion level.  (TR 63.)  The VE further

testified that Plaintiff could perform work as a typist or as a data-entry clerk under the ALJ's

limitations.  (TR 64.)  The ALJ asked the VE if Plaintiff could perform any of these jobs if he were

limited to work at the sedentary exertion level.  (TR 65.)  The VE testified that Plaintiff "could

perform those jobs to which have (sic) skills that he acquired."  (TR 65.)

      The ALJ then asked the VE to consider a hypothetical individual the same age as Plaintiff

with the same education, training, and work experience as Plaintiff.  She told the VE to assume that

the person could lift only ten pounds, could only stand or walk one to two hours per day, and

required a sit-stand option as well as the ability to walk short distances when necessary.  (TR 65.)

The ALJ asked the VE whether there were any unskilled positions that such a person could perform

or whether there were any skilled positions that such a person could perform with previously

acquired training.  (TR 65.)  The VE testified that such an individual could perform work at the

unskilled, sedentary level in inspection, sorting, packaging, and assembly; the VE stated that there

were approximately 10,000 such jobs available in the state and 5,000 in southeast Michigan.  (TR

66.)  The VE added that there were also additional jobs in the service field at the sedentary level,

such as a surveillance systems monitor, a lobby attendant, an information clerk, an identification

badge checker, and a gate attendant.  (TR 67.)  She indicated that there were 14,000 such jobs

available in the state and 7,000 in southeast Michigan.  (TR 68.)  The VE also added that such a

person could perform skilled positions, such as a typist or data-entry clerk.  (TR 69.)

      The ALJ asked the VE whether her testimony would change if he added limitations to the

individual's ability to stoop, kneel, crouch, balance, or climb stairs, ladders, ropes or scaffolds.  (TR

68.)  The VE indicated that such limitations would not interfere with the individual's ability to

9

perform the jobs that she listed.  (TR 68.)  The VE acknowledged that if the person also required the ability to lie down at least and hour in the morning and an hour in the afternoon, such a limitation would preclude employment.  (TR 69.)  Likewise, if such an individual were limited to less than 90% productivity by headaches, such a limitation would preclude employment.  (TR 69-70.)

## IV.  ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 31, 2007, and that he suffered from severe disorders of the back, but he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments.  (TR 14.)  The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not wholly credible, and he afforded greater weight to the state-agency examiner's opinion than he did to the opinion of Plaintiff's treating physician.  (TR 16-17.)  Thus, the ALJ found that Plaintiff retained the residual function capacity to perform a full range of sedentary work.  (TR 14-17.)  The ALJ then determined that Plaintiff was capable of performing his past relevant work as a data entry clerk (TR 17-18) and then noted that because Plaintiff could perform a full range of sedentary work, a finding of "not disabled" was directed by Medical-Vocational Rule 201.24 (TR 18).  Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from June 18, 2009, through the date of the ALJ's decision.  (TR 18.)

## V.  LAW AND ANALYSIS

### A.  Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525,

528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

## B.    Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)    Plaintiff was not presently engaged in substantial gainful employment; and

(2)    Plaintiff suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff argues that this matter should

12

be reversed or remanded under sentence 4 for the following reasons: (1) the ALJ mistakenly determined that Plaintiff had worked or acquired skills as a data-entry clerk, which caused the ALJ to erroneously end his analysis at Step 4; (2) the ALJ did not properly support his determination that Plaintiff's treating physician should be afforded less than controlling weight; and (3) the ALJ did not properly support his determination that Plaintiff's testimony was not credible. (*See* docket no. 11 at 14-23.)

### 1.      Plaintiff's Past Relevant Work and the ALJ's Step-5 Finding

Plaintiff asserts that the ALJ erroneously found that he had past work experience as a data-entry clerk, which caused the ALJ to find that Plaintiff could perform past relevant work at Step 4. (Docket no. 11 at 19.)  Plaintiff contends that he was never actually employed as a data-entry clerk, so he never acquired any relevant skills under the guidelines; therefore, the VE mistakenly determined that Plaintiff "could perform those jobs to which have (sic) skills that he acquired." (Docket no. 11 at 18-19 (quoting TR 65) (citing 20 C.F.R. § 404.1568(d)).)  Defendant asserts that as part of a form that he completed, he filled out a "work background" section and listed "data entry" as part of his past work experience.  (Docket no. 14 at 13 (citing TR 156).)  Moreover, Defendant contends, Plaintiff explained that he was training in data entry at job corps.  (*Id.*)

The record is equivocal as to whether Plaintiff's training at job corps is sufficient to support the ALJ's finding that Plaintiff could perform work as a "data entry clerk."  The ALJ's decision is also internally inconsistent as it finds that "claimant is capable of performing past relevant work as a data entry clerk" but also notes that "[t]ransferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled."  (TR 17.)

Nevertheless, the Court need not determine whether Plaintiff was capable of performing work as a data-entry clerk because, as Defendant notes, the ALJ made an alternative finding at Step

13

5:

> Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform.  Therefore, the [ALJ] makes the following alternative findings for step five of the sequential evaluation process.

(TR 17.)  The ALJ found that considering Plaintiff's age, education, work experience, and ability to perform a full range of sedentary work, "a finding of 'not disabled' is directed by Medical-Vocational Rule 201.24."  The Court agrees and finds that the ALJ's Step-4 determination with regard to Plaintiff's training as a data-entry clerk, if erroneous, was harmless error.  Therefore, the Court recommends denying Plaintiff's motion with regard to this issue.

### 2.        Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.  20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of

14

determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. §
404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and
must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator
gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r*,
378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188,
at *5 (1996)).  If the opinion of a treating source is not afforded controlling weight, an ALJ must
apply certain factors in determining what weight to give the opinion, including (1) the length of the
treatment relationship and the frequency of examination, (2) the nature and extent of the treatment
relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a
whole, and (5) the specialization of the treating source.  *Wilson*, 378 F.3d at 544 (citation omitted).
Even then, a finding that a treating-source medical opinion is not well supported by medically
acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial
evidence in the case record means only that the opinion is not entitled to controlling weight, not that
the opinion should be rejected.   Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Plaintiff contends that the ALJ erred when he "discounted [Dr. Zamorano's] opinion because
'the specific objective findings needed to support the level of restrictions noted by Dr. Zamorano
are not documented.'" (Docket no. 11 at 20 (quoting TR 16).)  Plaintiff argues that "[i]t is unknown
what specific objective findings were deemed to be needed by the ALJ." (*Id..*)  Plaintiff asserts that
instead of properly affording Dr. Zamorano's opinion controlling weight, the ALJ gave great weight
to the opinion of the state examiner, who had no specialization in orthopedics or neurology. (*Id.* at
21.)

Here, the only opinions provided from Dr. Zamorano were her multiple notes that Plaintiff
was "totally disabled from work" due to "lumbar disc disease." (*See* TR 197, 267, 266.)  Thus,

because the issue of disability is reserved to the Commissioner, the ALJ was not required to afford

Dr. Zamorano's opinions controlling weight.  *Kidd* 283 Fed. Appx. at 341.

Plaintiff is correct that the ALJ did not specifically evaluate Dr. Zamorano's opinion under

the factors set forth in 20 C.F.R. § 404.1527, but the Sixth Circuit has upheld the decision of an ALJ

to give less than controlling weight to a treating physician without conducting such an analysis if

the ALJ provides "good reason" for the decision.  *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-

74 (6th Cir.2008).  That is, there is no per se rule that requires an articulation of each of the six

regulatory factors listed in 20 C.F.R. § 404.1527.  *Norris v. Comm'r*, No. 11-11974, 2012 WL

3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th

Cir. 2010)).  Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute

harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could

not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes

findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section

1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied

with the terms of the regulation."  *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006)

(citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).  "An opinion may be patently

deficient if the treating source offers no explanation to support it."  *Fleming v. Comm'r*, No. 10-25,

2011 WL 3049146 at *9 (E.D. Tenn. July 5, 2011) (citing *May v. Astrue*, 09-00090, 2009 WL

4716033 at *8 (S.D. Ohio Dec. 9, 2009) (finding a treating source opinion patently deficient where

the treating source simply checked boxes about the plaintiff's alleged disability and failed to provide

supporting explanations or objective evidence.").

Here, the ALJ acknowledged that Plaintiff had been treating with Dr. Zamorano since his

car accident in 2009, and the ALJ noted that Dr. Zamorano is a neurologist.  He also discussed all

16

of Plaintiff's complaints to Dr. Zamorano, his physical therapy, his test results, his epidural injections, and his choice to pursue conservative therapy instead of surgical options. The ALJ then stated that "the objective medical findings needed to support the level of restrictions noted by Dr. Zamorano are not document." (TR 16.) While not the essence of clarity, when read in context, this statement sets out the ALJ's belief that the medical records that he had just described do not support a finding that Plaintiff was "totally disabled from work." The Court agrees with the ALJ. In the medical evidence submitted by Plaintiff, Dr. Zamorano fails to offer any explanation to support her conclusions that Plaintiff is disabled, and she provides no other opinions. Thus, the Court finds that the ALJ provided good reason for his decision. Therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

### 3.        Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

17

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2).  The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain.  *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Plaintiff contends  that the ALJ erred when he "discounted Plaintiff's credibility about his limitations and impairments because 'the claimant's reported activities of daily living and social functioning do not sustain his allegations of disability,' [and because] '[t]he credibility of the claimant's allegations is weakened by inconsistencies in his testimony.'" (Docket no. 11 at 22 (quoting TR 17).)  Plaintiff argues that "the ALJ's decision does not discuss inconsistencies in the plaintiff's testimony." (*Id.*)  Defendant did not address this issue.  (*See* docket no. 14.)

Here, the ALJ began his discussion of Plaintiff's RFC by discussing Plaintiff's subjective complaints.  (TR 15.)  He noted that Plaintiff needed help putting on his shirt and shoes, that he could vacuum for 20 minutes but sometimes needed help, and that he could lift about 15 pounds. (TR 15.)  The ALJ then turned to Plaintiff's medical record and noted similar complaints.  (TR 16.) He discussed Plaintiff's treatment with Dr. Zamorano, and he acknowledged that Plaintiff continued to complain of pain after epidural injections.  (TR 16.)  The ALJ then considered Dr. Shaw's opinion

18

and examination, wherein Plaintiff complained of similar pain. He also acknowledged that Dr. Shaw found that Plaintiff could sit, stand, and walk, could bend limitedly, and could lift 10 to 15 pounds. (TR 16.) The ALJ then discussed Plaintiff's records from Access Rehab Plus, which also noted moderate difficulty with activities of daily living, like putting on his shoes and lifting or carrying more than 10 pounds. (TR 16.) The ALJ then concluded that Plaintiff's statements were not credible. (*See* TR 17.)

Nowhere in his opinion does the ALJ discuss the duration, frequency, or intensity of Plaintiff's pain; any aggravating factors; the effectiveness of any medications that Plaintiff had been taking; or any functional limitations due to Plaintiff's pain. (*See* TR 15-17.) The ALJ does discuss Plaintiff's daily activities and the treatment options other than medication that he has tried in an attempt to alleviate his pain, but the ALJ fails to explain how Plaintiff's allegations are internally inconsistent or inconsistent with his treatment records. At most, the ALJ explained how Plaintiff's allegations of pain are inconsistent with the objective medical records, but this is specifically the type of finding that the regulations do not allow. *See* 20 C.F.R. § 416.929(c)(2). Therefore, the Court recommends granting Plaintiff's Motion and remanding this matter so that the ALJ can articulate his reasoning to make clear to Plaintiff and to any subsequent reviewers the weight the ALJ gave to Plaintiff's statements and the reasons for that weight.

## VI.   CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 11) should be GRANTED IN PART and DENIED IN PART, and Defendant's Motion for Summary Judgment (docket no. 14) should be DENIED. This matter should be remanded so that the ALJ can articulate his reasoning to make clear to Plaintiff and to any subsequent reviewers the weight the ALJ gave to Plaintiff's statements and the reasons for that weight.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 24, 2013            s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE



## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 24, 2013             s/ Lisa C. Bartlett_____
                                 Case Manager

21